her owner may not now urge that the charter was for a shorter period. The question is whether, by fault of the Helios, the charterer was deprived of profitable use of the ship during any part of that time, and, if so, what legal damages accrued therefrom. The libelant's contention that the vessel was obliged to remain until all the iron was aboard is not approved, unless it could have been loaded and delivered, and the ship returned to New York, within the time actually occupied. It is not understood how a charter party for about a fixed time can be extended to cover the completion of an enterprise. The libelant judged that it could be done in six weeks, and for the purpose of covering unexpected delays the word "about" was used. Certainly, the space of two weeks should be the limit of such extension under the facts now presented. It may be that other elements of damage will be urged. It is not intended to fix or to suggest a rule of damage, but only to construe the charter in the matter of its duration.

THE C. F. ROE et al.

(District Court, E. D. New York. April 16, 1901.)

Towage—Liability of Tug for Injury to Tow.

A tug held in fault for an injury received by a schooner in tow, by striking against the piling at the side of a railway bridge, the draw of which was not opened in response to the tug's signal, on the ground that it failed to act with sufficient promptness in stopping the tow, as was its custom, being familiar with the locality, and with the fact that the draw might be found closed, when the tug came in full view of it, on account of the near approach of trains.

In Admiralty. Suit to recover damages for injury to tow.

Hyland & Zabriskie, for libelant.
William J. Kelly, for Long Island R. Co.
James J. Macklin, for The C. F. Roe.

THOMAS, District Judge. The railway of the Long Island Railroad Company is carried over Flushing creek by a drawbridge, herein called the "Railway Bridge." Some 480 feet north of it is the highway bridge. The channel between the bridges is practically straight, and the width is about 180 feet. North of the highway bridge the railway bridge can be seen whether the draw of the lower bridge is open or shut, but if the vessel be on the west side it is claimed that the railroad is entirely shut off, and it is probable that it is obscured. The west side is often preferable for heavy draught vessels, for the purpose of avoiding the easterly rocks, which extend for some distance below the bridge, and it was upon the westerly side that on August 16, 1900, the steam tug C. F. Roe approached the highway bridge in its undertaking to deliver the schooner Shepard and cargo at Jones' Dock, south of the railroad bridge. At a considerable distance north of the highway bridge the tug whistled for the opening of the draw in the highway bridge, and the same signal is practically used, at least it is available, to give notice to the tender of the draw in the railway bridge. When the tug had

passed the highway bridge, her pilot discovered that the upper bridge was closed, and at a time thereafter, which will be noticed, the tug dropped back alongside, on the port hand of the schooner, and made fast; but before the headway could be stopped the schooner struck against piles on the eastern side of the dock, and received the injury which is the subject of this libel. It is urged against the railroad company that the tender did not open the draw, nor give timely notice that it was closed, and against the tug that she entered the space between the two bridges without knowing the condition of the draw, and in not sooner stopping the schooner' upon the discovery that the draw was closed. The navigators of the tug were very familiar with the conditions. They knew that while yet north of the highway bridge they were not customarily advised whether the draw was open or shut; hence the present claim that the railroad company should have given a warning suitably north of the bridge was neither expected, and in fact such warning was contrary to the practice of the parties, in which there had been long acquiescence. Moreover, if the signal had been given and observed, it is obvious that the tug would not have stopped north of the highway bridge, because it was the invariable practice of this tug to go beyond the first bridge, and, if the draw was closed, to stop and await its opening. There was ample opportunity to do this in safety. Hence it is immaterial whether the bridge tender used a flag, as he states he did, to give notice that the draw was closed. The tug would not have stopped north of the bridge, and when he entered the bridge he saw that the draw was closed, and the tug was just where it was expected to be in such an event, and where it would have been in any case. Hence, while the tender was undoubtedly on the bridge, the probable absence of the flag is unimportant. Moreover, a train was shortly due, and there was no time to open the draw before it passed, and therefore the draw was properly closed. What, then, caused the accident? It was the failure of the tug to undertake sooner the stoppage of the schooner. The tug had been accustomed to conduct craft more easily managed, and the master made a miscalculation of his ability to arrest the speed of the schooner before she came on the piles at the left of the railway bridge, the contact with which was so moderate that the injury seems to have been due to some peculiarly unfortunate manner of striking. It is urged that the tug could not have stopped earlier, but it is believed that this contention is not sustained. The distance between the bridges permitted the tug to drop back and make fast some time before she did, as the schooner's hull was 115 feet, the hawser 60 feet, and the tug 65 feet, in length. Hence, when the stern of the schooner cleared the bridge, the bow of the tug was 240 feet from the upper bridge, in a place where the tug expected that the upper draw might be closed. At that time the tug should have gone back, and made fast at once, and begun to arrest the headway of the schooner. This maneuver was not undertaken until a considerable portion of this distance had been passed. The time was either slightly too short, or sufficient energy was not used to effect the desired stoppage. The fault of the pilot was that

of miscalculation, but it is sufficient to make the tug liable. There should be a decree dismissing the libel as to the railroad company, and adjudging the tug liable for the damages and costs.

---

## THE ASIATIC PRINCE.

### (Circuit Court of Appeals, Second Circuit. April 3, 1901.)

#### No. 51.

1. SHIPPING—DELIVERY OF CARGO—LOCAL LAW REQUIRING DELIVERY TO CUSTOMS OFFICERS.

Where, by the local law and usage, dutiable goods imported are required to be delivered to the customs authorities, who assume the responsibility of thereafter making delivery to the proper person on payment of the duty, a delivery by the ship to such authorities is a good delivery as between carrier and shipper.

2. PAYMENTS—APPLICATION BY AGREEMENT—RIGHT OF CREDITOR TO CHANGE.

Where a creditor has applied a payment to a particular indebtedness, and notified the debtor, who acquiesces therein, the application becomes a finality, and the creditor cannot thereafter change it without the debtor's consent.

3. SHIPPING—SUIT FOR WRONGFUL DELIVERY OF CARGO—DEFENSES.

Libelant shipped a consignment of goods to a customer at a Brazilian port, taking bills of lading to his own order. He applied a credit in his hands upon the purchase price, and attached the bills to a draft for the balance, and forwarded the same for collection to a bank by the same ship, and also a letter of advice to the purchaser. The latter acquiesced in the payment applied, but, having made further remittances to apply on such consignment in ignorance of the draft, at first objected to its payment, but later deposited its amount with the bank. Before the bills had been delivered to him, however, the bank received from libelant a second draft for the full value of the goods to be substituted for the first, libelant stating that he had changed the partial credit first given. On the refusal of the bank to deliver the bills of lading except on payment of the second draft, the purchaser commenced judicial proceedings, in which, under an order of court, he obtained a deposit of the first draft, and deposited an amount sufficient for its payment, and upon proof of such facts the goods were delivered to him without the production of the bills of lading. His prior remittances, which were specifically stated to be on account of such consignment, and which were received by libelant, together with the amount first credited thereon by libelant, reduced the amount still due thereon far below that deposited. *Held*, that the purchaser was entitled to have such credits all applied upon the price of the goods, and hence was the equitable owner, and that the ship could not be held liable for their wrongful delivery.

Appeal from the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from a decree of the district court, Southern district of New York (97 Fed. 343), dismissing a libel to recover damages for the alleged nondelivery of certain merchandise shipped on the Asiatic Prince from New York in December, 1895, and January, 1896, to the port of Santos, in Brazil.

John L. Lewis, for appellant.

J. Parker Kirlin, for appellee.

Before WALLACE and LACOMBE, Circuit Judges, and THOMAS, District Judge.